# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2010

## STATE OF TENNESSEE  v. ANTIONETTE HORTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-00649     Carolyn Wade Blackett, Judge**

**No. W2009-00277-CCA-R3-CD   -   Filed March 3, 2010**

The defendant, Antionette Horton, was convicted by a Shelby County Criminal Court jury of second degree murder, a Class A felony, and was sentenced to eighteen years in the Department of Correction. On appeal, she argues that the State failed to meet its burden of proving beyond a reasonable doubt that the killing was not in self-defense or defense of others. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Claiborne H. Ferguson (on appeal) and Jake Erwin (at trial), Memphis, Tennessee, for the appellant, Antionette Horton.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Ray Lepone and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of a June 2006 fight at a park in the Binghampton community of Memphis between individuals from the Binghampton and Orange Mound communities during which the thirteen-year-old victim, Melissa Robinson, was shot to death by the defendant. As a result, the defendant was indicted on one count of first degree premeditated murder and, along with three co-defendants, one count of aggravated assault. The State nolle prossed the aggravated assault count at the close of its proof.

**State's Proof**

Carol Robinson, the victim's mother, testified that the victim was thirteen years old when she died on June 26, 2006.

Officer Taurus Nolen with the Memphis Police Department testified that he and Detective Billingsly were working a plain clothes operation in the area of Tillman Street and Mimosa Avenue in the Binghampton neighborhood on June 26, 2006. They were sitting in their cars when they saw a group of seventy to one hundred angry individuals. Officer Nolen said, "We saw weapons. I think I saw a baseball bat and something like that." The officers decided to investigate and drove toward the group, at which point Officer Nolen heard a gunshot. Officer Nolen heard squealing tires and saw a large, dark-colored vehicle driving away. He tended to the victim and radioed for assistance while Detective Billingsly maintained a perimeter. One witness told Officer Nolen that the suspect was driving a black or brown Buick Roadmaster, and he relayed that information to other officers. On cross-examination, Officer Nolen stated that there was a rivalry between individuals from the Binghampton and Orange Mound neighborhoods.

Marico Dye, who was fourteen years old at the time of the shooting, testified he was at Howze Park in the area of Tillman Street and Mimosa Avenue when the shooting occurred. He recalled seeing the victim in the park that day with some of her friends and said that he was standing about five or six feet from her when she was shot. Dye stated that before the shooting, he saw an unfamiliar black vehicle with tinted windows drive down Mimosa Street, park, and five African-American women get out and enter the park. The five women starting arguing with a group of nine or ten younger people in the park and then returned to their car when they saw they were outnumbered. No one was throwing anything at the women at the time, and they could have left the park at that point.

Dye testified that the women returned to their car, got weapons, and reentered the park. Dye stated that the women were armed with three bats and a knife. He recognized two of the women and recalled that "Quita" had a bat and "Sharday"[1] had a knife. He noted that most of the women appeared to be no older than twenty-five, but one appeared to be in her thirties. A woman from Binghampton named Shay told the five women, "We [are] not going to let you fight these young kids[,]" and the women started to leave. As the women were returning to their car, the group of nine or ten younger people started throwing objects from the ground, such as rocks, sticks, and glass, at them.

---

[1]Dye testified that he thought Sharday's real name was Shanika Batts.

Dye testified that when the women got back to the vehicle, the driver pointed a gun out the window and fired two shots. Dye described the driver as having "a Mohawk [hair]style with braids on the side, with some hair in the middle [and] two gold teeth in her mouth." When Dye heard the shots, he ducked down to keep from getting hit.

Thirty-five-year-old Terrance Rossell testified that he lived in the Binghampton neighborhood and was playing with his dogs in Howze Park on June 26, 2006. He said that several different groups were in the park that day participating in various activities. As he was walking his dogs, he saw a black Buick Roadmaster pull up and four women get out of the car. Rossell noted that none of the women in the vehicle looked familiar to him, and they all appeared to be "kind of young" with the exception of one who was older than the rest. When they exited the vehicle, the older woman took off her hair piece and said something along the lines of "It is on" or "I'm fixing to do this."

The four women approached a group of nine people from the Binghampton neighborhood who were already in the park but then returned to the vehicle and procured weapons, two bats and a tire iron, from the trunk before returning to the park. As the armed women approached the Binghampton group, some members of the group grabbed bottles, blocks, and bricks off the ground. The women started backing up toward the Roadmaster while making "bring it on" gestures. Rossell said that no one from the Binghampton group had thrown anything at that time.

Rossell testified that someone from the Binghampton group threw something and hit the car when the women started to get in the car. He recalled that one of the women tried to get in the car but was unable to because "the driver spanked off and pulled the arm out the window and took some shots." Rossell described that the driver stuck her arm out the window, pointed "right toward the park," and fired at least two shots. Rossell said that nothing was in the Roadmaster's path when it pulled away, and no one from the Binghampton group was on the other side of the park fence where the vehicle was located. He did not see anyone in the Binghampton group with a firearm.

Rossell testified that the other people in the park that day who had been doing other activities started "standing around watching trying to see what was going on" when the confrontation started between the four women and the Binghampton group. He said that there was not a crowd of seventy to one hundred angry people.

Sixteen-year-old Cardarius Polk testified that he was walking through Howze Park on his way home on June 26, 2006, when he ran into the victim and learned some girls had been fighting earlier. As he and the victim walked along, Polk observed two groups of females arguing back and forth. One group, a group of ten to fifteen, was from

Binghampton and the other group, a group from Orange Mound, had arrived in a Buick Roadmaster. Polk noted that the group from Orange Mound had bats for weapons, but the group from Binghampton did not have any weapons. Polk said that the group from Orange Mound did not "beat up on" the Binghampton group because he thought someone from the Binghampton group "threw a brick or something like that."

Polk saw one of the women from Orange Mound get in the Buick, point a gun out the driver's side window, and fire two or three times. He said that she had a "[t]wisted, mohawk" hairstyle, and she pointed the gun toward the crowd of people. Polk observed that the other women from Orange Mound were running toward the car when the driver fired the gun. Polk said that no one from the Binghampton group chased after, followed, or threw anything at the women from Orange Mound as they were returning to their car. Polk stated that at no time was there an angry mob of seventy to one hundred people. Polk acknowledged that in his statement to police he said that "one of the girls turned back around and the crowd start[ed] running towards the girls."

Major Howell Starnes with the Memphis Police Department testified that as he was responding to the scene of the shooting, he saw a black Buick Roadmaster, matching the description of the vehicle involved in the shooting, driving at a high rate of speed. The female driver "was aggressively holding the steering wheel" and disregarded the officers' signal to stop. Major Starnes noticed one of the car doors open and shut "a couple of times" while the car was still in motion.

Major Starnes testified that the chase continued until the Roadmaster pulled into the driveway of a residence, at which point the driver jumped out and ran into the house. Major Starnes's partner, Lieutenant Wright, chased the driver into the house. The front-seat passenger, Shareika Goodman, also ran toward the house but was caught by Major Starnes at the front door. Three other individuals, two females and a juvenile male, remained in the car and were secured by Lieutenant Clark. The driver struggled with Lieutenant Wright but was eventually apprehended. Major Starnes noted that the driver had tattoos on her neck and identified the defendant as the driver of the Roadmaster.

Major Starnes testified that one of the women, but not the defendant, offered to take the officers to the gun. The gun was found in the middle of the street, just south of where the officers had initially spotted the car.

Officer Timothy Brown with the Memphis Police Department testified that he was working as a crime scene investigator on June 26, 2006, and in such capacity responded to the scene at Howze Park. Officer Brown took measurements and sketched the scene. He also took photographs, including photographs of a park bench with blood nearby.

-4-

Officer Alan Pounds with the Memphis Police Department testified that he was working as a crime scene officer on June 26, 2006, and responded to two of the scenes in this case. Officer Pounds went to the scene where the gun was located, and he photographed it and took it into evidence. Officer Pounds testified that he also responded to the scene where the defendant and co-defendants were apprehended. He said that he took photographs at that location and identified them for the jury. Officer Pounds stated that one of the photographs showed a wig, a cell phone, and a knife in the front seat of the Roadmaster. Another photograph showed a baseball bat and a child's shoe in the backseat floorboard inside the vehicle. Yet another photograph showed a tire tool, a cup, and a washrag in the backseat floorboard.

On cross-examination, Officer Pounds stated that no shell casings or live rounds were found in the revolver. Officer Pounds noted that a couple of photographs of the Roadmaster showed possible bullet strike marks. On redirect examination, Officer Pounds said that he did not know what caused the marks on the Roadmaster or how long the marks had been there. He hypothesized that the marks could have been caused by someone throwing bottles or bricks at the car.

Lieutenant Mark Rewalt with the Memphis Police Department testified that he was working as a crime scene officer on June 26, 2006, and in that capacity, processed the black Buick Roadmaster involved in this case. Lieutenant Rewalt identified photographs of the Roadmaster and noted that some photographs showed damage to the driver's side of the hood and the left quarter panel. Lieutenant Rewalt noted that he retrieved from the car and tagged into evidence a baseball bat, tire tool, knife, cell phone, the defendant's driver's license, and $8.00 cash. He said that he noted in his report that the damage to the car hood was possibly caused by a bullet or a rock, but he did not know what actually caused the damage or when it occurred.

Dr. Feng Li, a specialist in forensic pathology and the medical examiner for Davidson County and Metropolitan Nashville, testified that he performed the autopsy on the victim in Memphis and determined that the cause of death was a gunshot wound to the head. He explained that the bullet entered the left side of the victim's head near the hairline and traveled left to right and slightly downward. Dr. Li recovered a small caliber, .22 or .25, bullet from inside the right side of the victim's brain. He did not discover any soot or stippling on the victim, meaning the victim was shot from a distance rather than close range.

Larissa Tuggle, also known as "ReRe," testified that she was fifteen years old at the time of the shooting. On that day, she was at Howze Park with the victim and two or three other friends when they saw two girls from Orange Mound. Tuggle and her friends went to get some other friends and returned to the park where she started a fight with one of the

girls from Orange Mound. In the meanwhile, the girl from Orange Mound had called other friends, and both groups of girls got involved in a fist fight.

Tuggle testified that, after the fight ended, she and her friends left the park and went to a friend's house. The girls from Orange Mound walked in the direction of a nearby store. After a short while, Tuggle and her friends returned to the park, and about fifteen minutes later, a black car drove by and stopped outside the park. A group of approximately six girls got out of the car. Tuggle said that "the momma . . . snatched off her ponytail" and began "talking crazy" to her and her friends. After they exchanged some words, the group from Orange Mound returned to their car and armed themselves with weapons – a bat, a tire iron, and a knife.

Tuggle and her friends picked up objects from the ground in an effort to push back the group from Orange Mound to their car. Some of the approximately thirty people in the park who were not with Tuggle and her friends also came to their aid. Specifically, an adult named Natasha told the Orange Mound group, "No, ya'll ain't fixing to fight these children." Tuggle said that some people from the Binghampton group threw little rocks, stones, and bottles at the Orange Mound group and their car.

Once the Orange Mound group got back to their car, one of the girls held her hand out of the driver's side window and shot two times. Tuggle described that the shooter held her hand out the window and pointed directly into the park. Tuggle stated that no one was surrounding the car, and they could have driven off at any time.

Corey Yancey testified that he was charged with facilitation of aggravated assault and accessory after the fact in conjunction with this case. According to Yancey, on June 26, 2006, he was walking toward the store in his neighborhood when he saw the defendant's mother, Sernitra Sheppard, also known as "Bookie," walking down the street. Sheppard, who was carrying a bat, informed Yancey that some girls had "jumped on" her daughter, Shareika Goodman, in Binghampton and was waiting for the defendant to pick her up so they could go get Goodman.

Yancey testified that the defendant arrived about ten or fifteen minutes later driving a black Buick Roadmaster, and the three of them met up with the defendant's cousin, Shanika Batts, also known as "Sharday," and Goodman. The four women and Yancey got into the Roadmaster and headed toward Howze Park to talk to the mother of "the girl who jumped Shareika [Goodman]." The defendant was driving and Sheppard was in the front passenger seat. He said that "the bats and stuff" were in the trunk.

Yancey testified that when they arrived at the park, the four women got out of the car

and started walking toward the swing sets. However, a group of ten or fifteen people of an indeterminable age started walking toward them and throwing things at them. The four women then backed up to the car and got weapons. They armed themselves with "[a] bat, a jack iron and a little steering wheel lock thing." He said that the defendant had the "little jack iron thing." The women returned to the park where they were met by an angry crowd of twenty to twenty-five people and "[c]rates and bottles and sticks flying toward them." The women started back toward the car again.

Yancey testified that the crowd was pushing them back toward the car and throwing things at the car. He noted that the crowd was outside of the park grounds at least to the rear of the car. He said that the defendant and Batts were the first to make it back, and the defendant stuck her head out the window to tell her mother and sister to get in the car. At that point, Yancey heard a gunshot come from inside the car. The rest of the group got in the car and, as they pulled away from the park, the defendant said, "[M]an, I think I shot somebody. I don't know if I shot somebody." No one was blocking the car's path when they pulled away.

Yancey testified that a police officer tried to pull them over, but the defendant kept driving. The defendant tried to hand him a black revolver, but he refused, and the gun was tossed out the window. The car finally stopped at the defendant's grandmother's house, and Goodman and Sheppard ran inside where they were apprehended. Yancey and the defendant got out of the car and surrendered.

Teri Arney, Special Agent Forensic Scientist with the Tennessee Bureau of Investigation, "TBI," testified that she was assigned to the firearms identification unit and in that capacity examined a firearm and a bullet recovered in this case. Agent Arney determined that the bullet recovered from the victim was a .22 caliber, as was the revolver connected to the shooting, and had the same rifling characteristics or lans and grooves as a test bullet fired from the revolver. However, due to the damage to the bullet, she was unable to conclusively ascertain whether the bullet was fired from that particular revolver. Agent Arney stated that another agent performed gunshot residue testing on the defendant. The report from that testing noted that, "Elements indicative of gunshot residue were inconclusive. These results cannot eliminate the possibility that the individual could have fired, handled or was near a gun when it fired."

**Defendant's Proof**

Twenty-two-year-old LaQuita Toney testified that on June 26, 2006, she, Shareika Goodman, and a man named "D" went to the swimming pool in Howze Park but arrived only thirty minutes before the pool was to close. After talking for awhile, they started

walking back through the park where they passed Larissa Tuggle without incident. According to Toney, Tuggle left the park and walked to some nearby apartments, then returned to the park with a group of ten or fifteen girls. Thereafter, Toney saw Goodman's cousin, Shanika Batts, walking to the store, and Tuggle yelled to her, "Orange Mound K," a phrase "[t]hat is like disrespecting Orange Mound."

Toney testified that Batts did not pay any attention to Tuggle but instead stopped to talk to Toney, Goodman, and "D." Tuggle talked loudly and swung her arms, threatening to fight Batts. Tuggle eventually hit Goodman, and the two of them began to fist fight. Tuggle's friends jumped in the fight, so Toney and Batts joined in. Toney grabbed a stick, and Tuggle and her friends stopped fighting.

Toney testified that Goodman had called the defendant before the fight to report that some girls were "trying to jump her." After the fight, the defendant arrived and took her and Goodman to Batts' apartment where they told Batts' mother about the fight. The defendant left to pick up her mother, Sheppard, and arrived a short while later with Sheppard and Corey Yancey. Toney's sister, Veronica Toney, also arrived at the same time. Toney got in the car with her sister, and everyone else got in the car with the defendant. Both cars headed back to the park "because [they] wanted a one-on-one" or fair fight with the other girls.

Toney testified that the defendant's car arrived at the park before she and her sister did, and the defendant walked in the park and demanded to know why the other girls had jumped her sister and asked for a "one-on-one" fight. The "crowd" responded that they "don't do one-on-one." Toney observed that the crowd consisted of fifty to sixty people of various age and gender. The crowd starting throwing things at them, so they retreated to the car and grabbed weapons. Toney and someone else grabbed a bat, Batts grabbed a tire iron, but the defendant did not get a weapon. Toney admitted that in her statement to the police, she said that the crowd did not start throwing things until after she and her friends were armed. However, Toney said that what was in her statement was not correct.

Toney testified that they returned to the park, armed, and the crowd of now sixty to seventy people threw bottles, bricks, and rocks at them. Toney heard a man in the group say, "We'll blow your ass off," and she responded, "I will bust your head with this bat." The defendant ran back to the car, while Toney walked backwards to avoid getting hit in the back of the head. The crowd continued to walk forward and throw rocks as all the women retreated to the car. She said that there were about ten people outside the gate who were not throwing things but were surrounding the car.

-8-

Toney testified that she was scared and thought they were "going to wind up dead" because they were so outnumbered. Toney told the defendant to drive off, and a bottle hit the defendant in the face as she was starting the car. Toney looked away from the defendant and then heard three gunshots. After the shots broke out, the crowd scattered allowing the defendant to drive away. Toney got in the car with her sister, and they left the park. Toney stated that before leaving, she commented to the crowd, "[Y]a'll are so stupid. You were trying to shoot us and ya'll shot somebody in ya'll crowd." However, Toney acknowledged that her sister related that the shots came from inside the defendant's car. Toney admitted that she did not see anyone in the crowd pull a gun or see the defendant fire any shots. Toney conceded that they could have left the scene instead of getting weapons and returning to the park. Toney denied giving the defendant a gun.

The twenty-one-year-old defendant testified that she was at a car wash on June 26, 2006, when she received a call from her mother, Sernitra Sheppard, informing her that her sister, Shareika Goodman, had been "jumped" by some girls. The defendant went to her cousin, Batts', house to pick up her sister, but her sister refused so she went to pick up her mother. The defendant picked up her mother and Corey Yancey from Joshua Parks' front yard and they went to Batts' apartment. The defendant recalled that her mother had a bat in her hand at Parks' house but put the bat in the trunk before going to Batts' house.

The defendant testified that Goodman and Batts were upset about the incident, and Sheppard wanted to speak with someone about what had sparked the fight. The defendant, Sheppard, Goodman, Batts, and Yancey got in the defendant's car and went to the park. LaQuita Toney and her sister, Veronica, also headed toward the park in Veronica's car.

The defendant testified that Sheppard led their group of five into the park where they were confronted by fifty to sixty people from Binghampton. The defendant asked why they did not have a "one-on-one" fight instead of "jumping" on the girls, and the group responded that they did not do "one-on-one." The Binghampton group started saying derogatory things about Orange Mound, and the Orange Mound group "[p]ass[ed] words" back. The defendant said that the Binghampton group started throwing bricks, bottles, and sticks at them.

The defendant testified that her group left the park and walked to Toney's sister's car because she had bats in her trunk. The defendant explained that she only had a tire iron in her car. Sheppard and Toney both grabbed bats and the defendant did not have a weapon. The defendant's group walked back into the park, and the Binghampton group continued to throw things at them. A man from the Binghampton group said, "We['re] going to blow your ass off." The defendant turned around and started back to her car, while the rest of her group walked backward toward the car as the Binghampton group pushed toward them.

-9-

The defendant testified that she made it to the car first and got in the driver's seat. Yancey, who had remained in the car, told the defendant that he was not going to let the crowd bother Sheppard or "he was going to shoot somebody." Yancey showed the defendant a gun, which the defendant took and placed in the front seat saying that they were not going to shoot anyone.

The defendant testified that Batts made it back to the car, but the defendant could not see her mother or sister through the crowd. The crowd was coming toward her car, and some people were already surrounding it. According to the defendant, a man in a white tee-shirt and blue shorts raised his shirt as if reaching for a gun. The defendant grabbed the gun from the seat and shot one time in the air because the crowd around her car made it difficult for her to leave. The defendant said that when she fired the gun, her car was in drive but unable to be moved because of the crowd. The crowd threw bricks, bottles, and sticks at her car. She said that she was scared the crowd was going to kill or hurt them.

The defendant testified that after she fired the shot, the crowd moved out of the way so she could leave. She picked up her mother and sister not far down the street. When Sheppard got in the car, she said that there was a man firing a gun. The defendant drove away but not at a high rate of speed. The defendant saw a truck with a flashing light, but it did not have a siren and did not signal for her to pull over. When they saw that the truck was turning around, Goodman handed the gun to Yancey who threw it out the window.

The defendant testified that she drove to her grandmother's house, and Sheppard and Goodman jumped out of the car and ran into the house. The defendant remained in the car. The defendant said that she did not intend to shoot anyone, and she only fired the gun because she was scared and thought the crowd was going to try and kill them. The defendant did not recall saying to Yancey that she thought she shot somebody.

On cross-examination, the defendant acknowledged that they could have left the park after the initial encounter with the crowd, but Sheppard, Goodman, and Toney wanted to fight because the crowd had thrown bottles and bricks at them. The defendant admitted that the Binghampton crowd wanted her and her group to leave. The defendant testified that even though there was a crowd of fifty to sixty people throwing things at them, no one in her group was seriously injured and at most sustained bruises. The defendant denied telling the police that she got the gun from LaQuita Toney although that was in her statement. The defendant admitted firing one shot but said that two or three other shots came from out of the park as she was driving off.

Following the conclusion of the proof, the jury convicted the defendant of the lesser included offense of second degree murder.

## ANALYSIS

The defendant challenges the sufficiency of the convicting evidence. Specifically, she argues that the State did not meet its burden of proving beyond a reasonable doubt that the killing was not in self-defense or defense of others.

When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). At the time of the offense, the self-defense statute provided:

> A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is

immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (2006). A person is not justified in threatening or using force against another person if that person provoked the other's use or attempted use of unlawful force, unless the original provoker abandons the encounter or clearly communicates his intent to abandon the encounter and the other person nevertheless continues or attempts to use unlawful force. Id. § 39-11-611(d)(1) (2006).

When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998), perm. to appeal denied (Tenn. Feb. 1, 1999) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527.

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612 (2006).

The defendant argues that the evidence shows she acted in self-defense or the defense of others, and, even if she is viewed as the original provoker, she abandoned the encounter.

-12-

As to the defendant's claim that she acted in the defense of her mother and sister, we note that she has arguably waived this claim for failing to raise it in her motion for new trial. In her motion for new trial, the defendant argued that the facts "g[a]ve rise to self defense or at the least adequate provocation for [her] actions." On appeal, the defendant has abandoned her claim of adequate provocation for her actions. Instead, she added the additional claim of defense of third persons to her self-defense claim. "It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court." State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988) (citations omitted).

Even if not waived, upon review, we conclude that the evidence is sufficient to sustain the defendant's conviction for second degree murder and reject her claims of self-defense or the defense of others. In the light most favorable to the State, the evidence showed that the defendant, her mother, her sister, her cousin, and friends went to Howze Park to confront a group of girls who had earlier gotten in a fight with the defendant's sister. The adults in the Binghampton park refused to allow the defendant's Orange Mound group of older women fight the younger girls, and, seeing they were outnumbered, the Orange Mound group returned to the car and retrieved weapons.

The Orange Mound group returned to the park and the Binghampton group threw objects from the ground in an effort to get the armed Orange Mound group to leave the park. The Orange Mound group began heading back toward the car, while some members of the group continued to make "bring it on" gestures to the Binghampton group. When the defendant made it back to her car, she had a clear path to leave but instead shot a .22 caliber gun into the crowded park. As a result, thirteen-year-old Melissa Robinson was struck by the bullet and killed. The Orange Mound group drove away from the scene, not pulling over when signaled to by officers and disposing of the gun along the way – an act inconsistent with a claim of self-defense. See State v. Curtis Daniel Hart, No. W2006-01332-CCA-R3-CD, 2007 WL 2284815, at *7 (Tenn. Crim. App. Aug. 9, 2007), perm. to appeal denied (Tenn. Jan. 28, 2008).

Although some witnesses may have testified that members of the Orange Mound group were in fear for their lives, it was the province of the jury to accredit or discredit such testimony. Likewise, testimony that the defendant's car was surrounded by a crowd throwing things at her car was contradicted by other testimony that no one was in the way of the defendant leaving. Also, we note that the jury may have determined, as its prerogative, that the Orange Mound group was not in danger of suffering serious bodily injury, especially when no one in the Orange Mound group suffered more than a bruise although they were supposedly being pelted with rocks and bottles by a group of over fifty people. We also note that the jury, again, as its prerogative, may have found that even if the defendant reasonably believed that the use of force was necessary to protect herself or her

family, that the degree of force used, shooting into a crowd of people, was unreasonable. Moreover, contrary to the defendant's testimony that her group was clearly retreating, there was some testimony that even though they were backing up, they continued to make "bring it on" gestures toward the Binghampton group. All of the testimony was heard and assessed by the jury as the trier of fact. We will not second guess the jury's determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE